UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISON

STEVEN GILLMAN,

          Plaintiff,                Case No. 21-cv-12762

v                                 HON. MARK A. GOLDSMITH

CITY OF TROY et al.,

          Defendants.

_____/

## OPINION & ORDER
### (1) DENYING DEFENDANT GREEN-HERNANDEZ'S MOTION FOR SUMMARY JUDGMENT (Dkt. 40), (2) GRANTING DEFENDANT CITY OF TROY'S MOTION FOR SUMMARY JUDGMENT (Dkt. 37), AND (3) GRANTING DEFENDANT GREEN-HERNANDEZ'S MOTIONS TO STRIKE PLAINTIFF'S PROPOSED EXPERTS (Dkts. 42, 44, 48)

Steven Gillman brought this deliberate indifference and gross negligence suit as the personal representative of the estate of his deceased wife, Megan Miller, who passed while she was in the custody of the Troy Police Department. The two Defendants in this case—the City of Troy and Julie Green-Hernandez—each move for summary judgment (Dkts. 37, 40). Green-Hernandez also moves to strike Gillman's proposed experts (Dkts. 42, 44, 48). For the reasons that follow, the Court denies Green-Hernandez's motions for summary judgment, grants the City's motion for summary judgment, and grants Green-Hernandez's motions to strike.[1]

_____

[1] Because oral argument will not aid the Court's decisional process, the motions will be decided based on the parties' briefing. See E.D. Mich. LR 7.1(f)(2); Fed. R. Civ. P. 78(b). In addition to the motions for summary judgment, the briefing includes Gillman's response to the City's motion (Dkt. 65), the City's reply (Dkt. 79), Gillman's response to Green-Hernandez's motion (Dkt. 76), and Green-Hernandez's reply (Dkt. 77).

## I.  BACKGROUND

Miller spent three days in the City's custody, during which period she vomited several times while suffering heroin withdrawal.  The custodians charged with supervising her, including Green-Hernandez, did not seek medical attention in response to these symptoms.  Miller died after ingesting fentanyl that she had apparently hidden on her person, per the defense's expert evidence.

### A. Arrest and Detainment of Miller

In July 2020, police officers with the City of Troy sought to interview Miller regarding the circumstances of the June 15, 2020 death of Ellee Gillman—Miller and Gillman's infant child—due to fentanyl poisoning.  City SOMF ¶¶ 1–2; Pl. Resp. to City SOMF ¶¶ 1–2.

The City's special investigations unit arrested Miller on July 16, 2020 based on a parole absconder warrant and transported her to the City's lockup facility.  City SOMF ¶¶ 3–4; Pl. Resp. to City SOMF ¶¶ 3–4.  An officer searched Miller's person both before securing Miller in the vehicle and after arriving at lockup, and she found no contraband.  City SOMF ¶¶ 5, 7; Pl. Resp. to City SOMF ¶¶ 5, 7.  Two police service aids (PSAs) searched Miller's person and belongings again as part of the booking process.  Green-Hernandez SOMF ¶ 7; Pl. Resp. to Green-Hernandez SOMF ¶ 7.

Miller informed the PSAs that she had taken heroin about an hour previously.  Green-Hernandez SOMF ¶ 7; Pl. Resp. to Green-Hernandez SOMF ¶ 7 (citing Booking Form (Dkt. 75-6) (reflecting that Miller was experiencing heroin withdrawal, that she had "last taken 1 h[ou]r prior to arrest," and that she was suffering "abdominal pains") (capitalization modified)).  Detective Kristine Shuler then interviewed Miller, and Miller told Shuler that she had been using heroin "a lot" and that she expected to "probably" experience withdrawal symptoms within about "a day."  Green-Hernandez SOMF ¶ 9; Pl. Resp. to Green-Hernandez SOMF ¶ 9.  Miller was then

detained in a holding cell.  Green-Hernandez SOMF ¶ 10; Pl. Resp. to Green-Hernandez SOMF ¶ 10.

**B. Green-Hernandez's Supervision of Miller**

Miller was in that same holding cell on July 19, 2020 at 7:00 a.m.—about two-and-a-half days after her initial arrest on July 16—when Green-Hernandez signed in for a shift that was scheduled to last until 5:00 p.m.  Green-Hernandez SOMF ¶ 17; Pl. Resp. to Green-Hernandez SOMF ¶ 17.  When Green-Hernandez began her shift, she reviewed the booking materials for each detainee and noticed that Miller's booking materials indicated that she had been going through drug withdrawal.  Green-Hernandez SOMF ¶ 18; Pl. Resp. to Green-Hernandez SOMF ¶ 18.  Upon arrival at the facility at about 7:00 a.m., Green-Hernandez also individually checked on each detainee under her supervision.  Green-Hernandez SOMF ¶ 18; Pl. Resp. to Green-Hernandez SOMF ¶ 18.  Green-Hernandez spoke with two other PSAs who had been on duty while Miller was in custody—Genslak[2] and Douglas Marvin—and they both informed her that Miller had been vomiting.  Green-Hernandez SOMF ¶ 19; Pl. Resp. to Green-Hernandez SOMF ¶ 19.

PSAs were responsible for performing routine cell checks to account for each detainee in lock-up and for reporting anything unusual to an on-duty police officer.  Pl. Resp. to Green-Hernandez SOMF ¶ 8; Green-Hernandez Reply to Pl. Resp. to SOMF ¶ 8.  Troy Police Department General Order 5.23.19(A) states: "A PSA shall conduct a physical observation of each prisoner once every thirty (30) minutes."  Troy General Order at 37 (Dkt. 76-17).  Additionally, under General Order 5.23.19(B), "[w]hen a prisoner is deemed to be a medium or high security, medical, or psychological risk, a PSA shall conduct a physical observation of that prisoner as often as

---

[2] The parties do not identify Genslack's first name in their briefing.

possible and at least once every fifteen (15) minutes." Id.  PSAs are required to log these physical observations using a time stamp in the facility's control center.  Id.

Further, Troy Police Department General Order 5.23.13 states that "Officers and Lockup personnel need to be aware that intoxicated prisoners present increased risks for serious medical problems, including death, while in custody"; that "[p]ersonnel need to be alert for indicators that a prisoner may be at risk to suffer a serious medical problem due to their intoxicated state"; and that "[i]ndicators of severe intoxication include . . . vomiting . . . ." Id. at 32.

According to Green-Hernandez's testimony, Green-Hernandez and Marvin—the two PSAs on duty to begin July 19, 2020—conducted multiple cell checks that morning, which they documented on the time stamp machine.  See Green-Hernandez Dep. at 51 (Dkt. 38-4).  The cell check log for July 19 accords with Green-Hernandez's testimony that the PSAs checked Miller's cell at the following times: 7:00 a.m. (Marvin), 8:03 a.m. (Green-Hernandez), 8:25 a.m. (Green-Hernandez), 8:28 a.m. (Marvin), 10:12 a.m. (Marvin), 10:23 a.m. (Green-Hernandez), 10:40 a.m. (Marvin), and 11:13 a.m. (Marvin).  Cell Check Log (Dkt. 40-25); Green-Hernandez Dep. at 49–52.

Marvin's shift ended at 12:00 p.m., and a new PSA—Hirsch[3]—joined Green-Hernandez on duty.  Green-Hernandez SOMF ¶ 21; Pl. Resp. to Green-Hernandez SOMF ¶ 21.  Green-Hernandez performed another check of Miller's cell at 12:29 p.m.  Cell Check Log; Green-Hernandez Dep. at 51–52.

At 12:40 p.m., Green-Hernandez visited Miller to respond to Miller having thrown trash out of her cell.  Green-Hernandez SOMF ¶ 23; Pl. Resp. to Green-Hernandez SOMF ¶ 23.  Green-Hernandez testified that Miller appeared "angry," was "yelling . . . about her situation," and was

---

[3] The parties do not identify Hirsch's first name in their briefing.

irritated that she was "still there."  Green-Hernandez Dep. at 67.[4]  Green-Hernandez noticed that there was vomit in Miller's cell.  Id.  According to Green-Hernandez's testimony, she did not notice that Miller was in any physical distress or that there was anything "unusual about her presentation."  Id.  Green-Hernandez recalled that Miller "was still talking, walking and demonstrating proper movements," "was not slurring her speech," "was still taking coherently," and "was not showing any distress"—except that she noticed Miller's vomit.  Id. at 96.

Miller told Green-Hernandez that "she was going through detox," and Green-Hernandez "asked her if she wanted medical attention."  Id. at 68.  Per Green-Hernandez, Miller "said no, that she was fine, that she just wanted a juice[,] and she wanted something to clean up the cell with." Id.  Green-Hernandez returned with a paper towel and disinfecting wipes at about 12:45 p.m.  Id. at 68.  At about 1:00 p.m., Green-Hernandez testified that she brought Miller her meal and a new juice.  Id. at 68–69.  Green-Hernandez recalled that Miller was "laying down" when she entered the cell, and Green-Hernandez "informed her 'Here's your hot meal and here's another juice for you' and she said okay."  Id. at 69.

Green-Hernandez recalled that she viewed Miller's cell on camera "at least one time" between 1:30 and 2:00 p.m. from the control room, and Green-Hernandez "saw [Miller] move her right foot" while laying down.  Id. at 94.  Green-Hernandez thought that Miller was "okay" on this basis.  Id.  This remote review constituted a proper "cell check," but Green-Hernandez testified that she "forgot to punch" the time stamp machine, and this cell check does not appear on the cell check log.  Id.; Cell Check Log.

---

[4] A "prisoner custody report," a form filled out during booking, noted that the Michigan Department of Corrections was scheduled to pick up Miller from the City's lock-up facility two days later, on July 21, 2020.  Pl. Resp. to Green-Hernandez SOMF ¶ 4 (citing Prisoner Custody Report (Dkt. 76-5)); Green-Hernandez Reply to Pl. Resp. to SOMF ¶ 4.

The cell check log and Green-Hernandez's testimony reflect that Hirsh checked Miller's cell at 2:20 and 3:04 p.m., and that Green-Hernandez performed another cell check at 3:20 p.m. Green-Hernandez Dep. at 53; Cell Check Log.  Gillman notes that there is no video evidence to confirm that Hirsh checked Miller's cell at these times, see Pl. Resp. to Green-Hernandez SOMF ¶¶ 23–24, which Green-Hernandez explains by submitting that PSAs can perform remote cell checks from the control room, see Green-Hernandez Reply to Pl. Resp. to SOMF ¶¶ 23–24.

When Green-Hernandez checked Miller's cell at 3:20 p.m., she found Miller unresponsive; Miller appeared to be unconscious.  Green-Hernandez Dep. at 53; Cell Check Log; Green-Hernandez SOMF ¶ 28; Pl. Resp. to Green-Hernandez SOMF ¶ 28.  Green-Hernandez also noted that there was "fresh vomit" in Miller's cell.  Pl. Resp. to Green-Hernandez SOMF ¶ 26; Green-Hernandez Reply to Pl. Resp. to SOMF ¶ 26.

Green-Hernandez immediately yelled for Hirsch to call an ambulance and went to the control room to tell dispatch to send officers.  Green-Hernandez SOMF ¶ 29; Pl. Resp. to Green-Hernandez SOMF ¶ 29.  Green-Hernandez left Miller unattended for at least three minutes before help arrived.  Pl. Resp. to Green-Hernandez SOMF ¶ 30; Green-Hernandez Reply to Pl. Resp. to SOMF ¶ 30.  After staff at the facility provided Narcan to Miller, attempted to use a defibrillator, and initiated CPR, Emergency Medical Services personnel arrived and transported Miller to Beaumont-Troy Hospital, where she was pronounced dead.  Green-Hernandez SOMF ¶¶ 30–31; Pl. Resp. to Green-Hernandez SOMF ¶¶ 30–31.

### C. Cause of Miller's Death

The parties dispute the cause of Miller's death: heroin withdrawal or fentanyl ingestion.  In Green-Hernandez's view, "[s]ometime after 2:34 p.m. . . ., unbeknownst to PSA Green-Hernandez, Miller ingested a lethal fentanyl dose."  Green-Hernandez SOMF ¶ 28.

Gillman notes that no drugs or drug paraphernalia were discovered in Miller's cell or on her person, and that no jail footage indicates that Miller ingested any drugs.  Pl. Resp. to Green-Hernandez SOMF ¶¶ 37–39; Green-Hernandez Reply to Pl. Resp. to SOMF ¶¶ 37–39.  The footage of the jail cell, however, does not rule out the possibility that Miller ingested something off-screen.  The camera is positioned such that most or all of Miller's body is out of sight while she was reportedly lying down.[5]

Green-Hernandez supports her position that Miller died due to her ingestion of fentanyl by producing documentation from the Oakland County Medical Examiner, which includes (i) a toxicology report reflecting that a femoral blood drug screening detected 3.7 ng/mL of fentanyl in Miller's blood, see Medical Examiner Documents at PageID.1035–1037 (Dkt.40-26), (ii) an "autopsy protocol" identifying "fentanyl intoxication" as the "cause of death" and "chronic pulmonary disease" as a "contributory cause," id. at PageID.1039 (capitalization modified), and (iii) Deputy Medical Examiner Bernardino B. Pacris, M.D.'s "opinion" that Miller "died of Fentanyl intoxication" and that "[c]hronic obstructive pulmonary disease [COPD] was contributory," though "the manner of death [was] undeterminable," id. at PageID.1045.

Green-Hernandez also cites to the report of purported expert C. Dennis Simpson, Ed.D. See Simpson Rep. (Dkt. 77-6).  Simpson is a neuropsychopharmacologist—i.e., one who studies the psychoactive and psychotropic effects of drugs in humans, including how they are metabolized by and distributed in the body and the "expected behaviors of these drugs at varying dosage."  Id. at 2.[6]  Simpson opines that "Miller was experiencing mild Heroin withdrawal symptoms . . . during

---

[5] See Miller Cell Video, 12:40–2:00 p.m.; Miller Cell Video, 3:00–4:00 p.m.  These videos—attached to the City's motion for summary judgment as Exhibits 15 and 16—were filed through the Court's media file upload system and so are not available on the docket.

[6] Simpson submits that he has been part of the faculty of Western Michigan University for 45 years, and that he has testified as a neuropsychopharmacologist in over 600 state and federal cases

the majority of the time she was in the jail until the onset of Fentanyl effects." Id. at 5.  It is also

Simpson's opinion that Miller ingested fentanyl "either through oral [intake] or insufflation," and

that she had done so "at a maximum of 60 minutes prior to lethal effect," though "[t]he time could

be less." Id. at 5.  He states that the display of Miller's "first hierarchical symptoms of Fentanyl

overdose (drowsiness) . . . had to be within 60 minutes of her death." Id. at 5.  Simpson declines

to opine on the "polymorbid effect" of fentanyl and Miller's chronic COPD without "the specific

opinion of a board-certified Pulmonologist." Id.

Accordingly, Green-Hernandez also provides the report of a pulmonologist, purported

expert Thomas R. Gravelyn, M.D. See Gravelyn Report (Dkt. 77-5).[7]  Having reviewed materials

including the Medical Examiner records and the Troy Police Department records, Gravelyn opines

that Miller "appears to have died by a Fentanyl overdose, not by withdrawal from narcotics" and

states that he "agree[s]" with Pacris that Miller "died of Fentanyl intoxication and [Miller's] COPD

was contributory." Id. at PageID.3393–3395.

Gillman does not offer any expert evidence on the cause of Miller's death.[8]

---

without ever having been found unqualified to testify in this role.  See Simpson Rep. at 2.
Simpson's opinions are based on his review of materials including the Medical Examiner
documentation, over 400 peer-reviewed research articles, and record evidence on Miller's behavior
prior to her death.  Id.

[7] Gravelyn submits that he is an assistant professor of Medicine at the University of Michigan
Medical Center; site director for the Pulmonary, Critical Care and Sleep Medicine Division of
Integrated Health Associates, a 500-physician multispecialty group; a practitioner of over 25 years;
and a doctor certified by the American Board of Internal Medicine in Internal Medicine,
Pulmonary Medicine, Critical Care Medicine, and Sleep Medicine.  Gravelyn Rep. at
PageID.3393.

[8] Gillman considers Green-Hernandez's expert reports to be "procedurally defective, because, as
[]unsworn report[s], [they are] inadmissible hearsay, which the Court cannot consider for purposes
of summary judgment."  Br. in Supp. Resp. to Green-Hernandez Mot. at 26 (quoting Gohl v.
Livonia Pub. Sch., 134 F. Supp. 3d 1066, 1077 (E.D. Mich., 2015)).  Gillman is correct that the
expert reports attached to the original motion for summary judgment are unsworn; however,
Green-Hernandez attaches to her reply (i) a new version of the Simpson report that contains a

**D. Discipline for Green-Hernandez**

Troy Police Department placed Green-Hernandez and seven other PSAs under investigation, and Green-Hernandez received a 30-day unpaid suspension following a <u>Loudermill</u> hearing.  Pl. Resp. to Green-Hernandez SOMF ¶¶ 47–48, 52, 55; Green-Hernandez Reply to Pl. Resp. to SOMF ¶¶ 47–48, 52, 55.  The letter notifying Green-Hernandez of the <u>Loudermill</u> hearing submits that Green-Hernandez violated multiple sections of the General Orders, including General Order 5.23.12(A) and (B).  <u>See</u> <u>Loudermill</u> Notice (Dkt. 76-16).[9]  Green-Hernandez emphasizes that the <u>Loudermill</u> hearing notice "outlines allegations, not findings, from the City's investigation."  Green-Hernandez Reply to Pl. Resp. to SOMF ¶ 56.

---

declaration that satisfies 28 U.S.C. § 1746(2) (Dkt. 77-6) and (ii) a new version of the Gravelyn report that has been notarized (Dkt. 77-5).  Gillman did not file any motions to limit or exclude Green-Hernandez's expert testimony by his deadline of February 17, 2023.  <u>See</u> 12/22/22 Order (Dkt. 33).

[9] A <u>Loudermill</u> hearing is designed to satisfy the requirement for "some kind of a hearing prior to the discharge of an employee who has a constitutionally protected property interest in his [or her] employment."  <u>Cleveland Bd. of Educ. v. Loudermill</u>, 470 U.S. 532, 542 (1985) (punctuation modified).

The letter directed to Green-Hernandez states:

> On July 19, 2020, you were working as a Police Service Aide in the lock-up when a prisoner vomited or dry heaved at least 13 times.  You did not request medical assistance or notify a supervisor.  You failed to ensure that prisoner checks were done every 30 minutes multiple times during your shifts.  You did not consider conducting checks every 15 minutes.  You did not observe that the prisoner appeared to be incapacitated for more than two hours.  You chose to wait for sworn personnel before entering the cell and rendering aid.

<u>Loudermill</u> Notice.

## II. ANALYSIS

Gillman's complaint asserts (i) deliberate indifference under the Fourteenth and Eighth Amendments against Green-Hernandez and the City and (ii) gross negligence against Green-Hernandez. See Compl. In the present briefing, Gillman waives his Eighth Amendment claim and asserts deliberate indifference only under the Fourteenth Amendment.[10] Green-Hernandez and the City move for summary judgment.

The Court proceeds by considering whether summary judgment is proper on (i) the deliberate indifference claim against Green-Hernandez, (ii) the gross negligence claim against Green-Hernandez, and (iii) the claim for municipal liability against the City.[11] It then considers Green-Hernandez's motions to strike Gillman's experts.

---

[10] Gillman submits that "it is clear that the 14th Amendment is the applicable avenue of relief" because it is "undisputed that Megan Miller was a pretrial detainee at the time of these events." Br. in Supp. Resp. to Green-Hernandez Mot. at 20 (citing Phillips v. Roane County, 534 F.3d 531, 539 (6th Cir. 2008) ("[W]here [a] claim [of deliberate indifference] is asserted on behalf of a pre-trial detainee, the Due Process Clause of the Fourteenth Amendment is the proper starting point."). Gillman offers no defense to Green-Hernandez's argument that his Eighth Amendment claim should be dismissed. See id. The City agrees with Gillman that the Fourteenth Amendment, not the Eighth Amendment, provides the applicable standard. See Br. in Supp. City Mot. at 14.

Green-Hernandez asserts that—because Miller was arrested on a parole violation—"Plaintiff's argument that the 14th Amendment applies to this case is likely incorrect." Green-Hernandez Reply at 7. However, to the extent that Green-Hernandez suggests that Gillman's claim is cognizable only under the Eighth Amendment, she presents this argument only in her reply, not in her motion. See id.; Br. in Supp. Green-Hernandez Mot. at 25 (arguing for a grant of summary judgment "whether [Miller's rights] fall under the purview of the Eighth or Fourteenth Amendment"). An issue raised for the first time in a reply to a response is deemed waived. Scottsdale Ins. Co. v. Flowers, 513 F.3d 546, 553 (6th Cir. 2008). The Court proceeds by considering Gillman's deliberate indifference claim under the Fourteenth Amendment.

[11] In assessing whether either party is entitled to summary judgment on any claim, the Court applies the traditional summary judgment standard as articulated in Scott v. Harris, 550 U.S. 372, 380 (2007). The movant is entitled to summary judgment if that party shows that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). If the movant makes an initial showing that there is an absence of evidence to support the nonmoving party's case, the nonmovant can survive summary judgment only by

### A. Deliberate Indifference Under Fourteenth Amendment

To prevail on a Fourteenth Amendment deliberate indifference claim, Gillman "must show (1) that [Miller] had a sufficiently serious medical need and (2) that each defendant 'acted deliberately (not accidentally), and also recklessly in the face of an unjustifiably high risk of harm that is either known or so obvious that it should be known.'" Helphenstine v. Lewis Cnty., Kentucky, 60 F.4th 305, 317 (6th Cir. 2023) (quoting Brawner v. Scott Cnty., Tennessee, 14 F.4th 585, 596 (6th Cir. 2021) (punctuation modified)).

The Court first considers together (i) whether Miller had a serious medical need and (ii) whether any such need presented a high risk of harm of which Green-Hernandez was aware or should have been aware. Two distinct medical needs are at issue: (i) the medical need presented by Miller's continual vomiting over multiple days, and (ii) the medical need presented by Miller's fentanyl overdose.

### 1. Whether continued vomiting evidenced a serious medical need causing high risk of harm of which Green-Hernandez knew or should have known

Miller vomited several times while in custody. When Green-Hernandez began her shift on July 19, 2020—Miller's third day in custody following her July 16 arrest—she was told that Miller had been vomiting. Green-Hernandez SOMF ¶ 19; Pl. Resp. to Green-Hernandez SOMF ¶ 19. When Green-Hernandez checked Miller's cell at 12:40 p.m., she noticed that Miller had vomited again. See Green-Hernandez Dep. at 67. And there was "fresh vomit" in Miller's cell when Green-Hernandez found Miller unresponsive at 3:20 p.m. Pl. Resp. to Green-Hernandez SOMF ¶ 26; Green-Hernandez Reply to Pl. Resp. to SOMF ¶ 26.

---

coming forward with evidence showing there is a genuine issue for trial. Celotex Corp. v. Catrett, 477 U.S. 317, 324–325 (1986).

Green-Hernandez's persistent vomiting is similar to the symptoms exhibited in Helphenstine, where jail officials moved a detainee to a detoxication cell after they observed him vomiting.  60 F.4th at 311.  Over the next two days, the detainee vomited and soiled himself, was observed drooling, and was reported to be "lethargic" and "really not coherent."  Id. at 312 (punctuation modified).  He died three days after having initially been observed vomiting—either from a fentanyl overdose or from complications related to alcohol withdrawal.  Id. at 313, 326.  The Sixth Circuit reversed the grant of summary judgment on Fourteenth Amendment claims to multiple jail officials who supervised the detainee—including the official who had initially observed the detainee's symptoms on the first day and "knew that he vomited at least once."  Id. at 317–318.  At this point, "a reasonable jury could conclude that [the detainee's] medical need was . . . so obvious that a lay person like [the official] should . . . recognize the need for medical attention."  Id. at 318.

Green-Hernandez denies that Miller had a serious medical need prior to her ingestion of fentanyl, insisting that "the only condition that PSA Green-Hernandez was aware Miller was dealing with was mild heroin withdrawal, which is a condition that is rarely deadly and is treated with fluids."  Br. in Supp. Green-Hernandez Mot. at 16.  Green-Hernandez relies on the report of Simpson, who opines that Miller was suffering from heroin withdrawal with symptoms that comported as "mild" on the Clinical Opiate Withdrawal Scale, a framework for categorizing withdrawal symptoms as "mild," "moderate," or "severe" and assigning corresponding treatment methods.  Simpson Rep. at 3.  Simpson submits that "[h]eroin withdrawal is very rarely life threatening" and that "mild" heroin withdrawal symptoms are "generally characterized as flu like symptoms."  Id.  Proper treatment for mild opiate withdrawal consists of "liquids with electrolytes for dehydration, aspirin, acetaminophen, [and] ibuprofen."  Id.

Contrary to Green-Hernandez's assertions, whether Miller had a serious medical need does not depend on whether her withdrawal was "life-threatening." The seriousness of Miller's medical need is an "objective[]" test. Helphenstine, 60 F.4th at 317. A medical need is "sufficiently serious" to warrant constitutional protection if it "is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." Id. at 318 (punctuation modified)).

Miller's state of continually vomiting over the course of three days constitutes an objectively serious medical need. "Vomiting is 'a clear manifestation of internal physical disorder.'" Id. (quoting Blackmore v. Kalamazoo Cnty., 390 F.3d 890, 899 (6th Cir. 2004) (finding it "[s]ignificant" that detainee "vomited" when determining that reasonable jury could find he had an obvious "serious need for medical care"). The Helphenstine court found that summary judgment was improper to a jail official who should have recognized the need for medical attention based on his awareness of a single physical symptom: he "knew that [the detainee had] vomited at least once." Id. at 317.

It is undisputed that Green-Hernandez was aware that Miller was continually vomiting, both from reports she had received and from her own personal observations. The Court finds that a reasonable jury could find that Miller's physical state in this circumstance demonstrates an obvious medical need that even a lay person should have recognized required medical attention, and that Green-Hernandez knew or should have known about the high risk of harm presented by this need. See id.; Blackmore, 390 F.3d at 899.

## 2. Whether fentanyl overdose was a serious medical need causing high risk of harm of which Green-Hernandez knew or should have known

Defendants emphasize that the cause of Miller's death was a fentanyl ingestion, not heroin withdrawal. See Br. in Supp. Green-Hernandez Mot. at 16, 18–19. Based on Defendants' uncontroverted medical evidence, there is no genuine dispute of material fact that fentanyl

13

ingestion was the cause of Miller's death, with COPD also a contributory cause.  See Simpson

Rep. at 5; Gravelyn Rep. at PageID.3393–3395; Medical Examiner Documents at PageID.1039,

1045.  Per this uncontested evidence, Miller ingested fentanyl—likely orally—no more than 60

minutes before "lethal effect."  Simpson Rep. at 6.  "It is impossible to determine the specific time

Ms. Miller began to display the first hierarchical symptoms of Fentanyl overdose (drowsiness),

but it had to be within 60 minutes of her death."  Id.

Expert evidence thus sets a boundary for the length of time between Miller's ingestion of

fentanyl and her death.  However, there is a genuine dispute of fact as to when precisely Miller

died, and thus a genuine dispute of fact as to when she could have exhibited symptoms of a fentanyl

overdose prior to her death.  Miller was known to have been vomiting, and according to Green-

Hernandez's own expert, vomiting may be a symptom of a fentanyl overdose.  Id. at 5.

Gillman insists that Miller "was last seen conscious around or between 12:30 p.m. and 1:00

p.m.," referring to Green-Hernandez's visits to Miller's cell at about 12:40 p.m., 12:45 p.m., and

1:00 p.m.  Pl. Resp. to Green-Hernandez SOMF ¶ 16.  Green-Hernandez testified that she saw

Miller move on camera—"kicking the blanket off" like "she was too hot"—"somewhere in th[e]

time frame" of between "1:30 [p.m.] and 2 [p.m.]."  Green-Hernandez Dep. at 136.  Green-

Hernandez submits that Hirsch remotely performed additional checks of Miller's cell at 2:20 p.m.

and 3:04 p.m., relying on Green-Hernandez's own testimony and the cell check log, see Green-

Hernandez SOMF ¶ 27; however, these sources do not establish that Hirsch confirmed that Miller

was conscious or moving at those times, see Green-Hernandez Dep. at 52–53; Cell Check Log.

Green-Hernandez does not argue that Miller was still alive when Green-Hernandez found her

unresponsive at about 3:20 p.m.[12]   The autopsy protocol establishes that Miller was officially

pronounced dead at 4:15 p.m.  See Medical Examiner Documents at PageID.1039.

Even if the Court accepts Green-Hernandez's testimony that Miller was alive as early as

1:30 p.m., see Green-Hernandez Dep. at 136, in that case, she could have ingested fentanyl 60

minutes earlier, at about 12:30 p.m., see Simpson Rep. 6.  Thus, it is possible that the vomit Green-

Hernandez noticed at about 12:40 p.m. was a symptom of her fentanyl overdose—as vomiting can

be a symptom of a fentanyl overdose.  Id. at 5.  Therefore, there is a genuine dispute of material

fact as to whether Green-Hernandez was alerted to signs that Miller had from a serious medical

need induced by her ingestion of fentanyl.

Green-Hernandez's exposure to this warning sign differentiates this case from the cases

cited by Green-Hernandez where courts awarded summary judgment to defendants on deliberate

indifference claims based on detainees' failure to exhibit symptoms alerting officials to their

serious medical needs after they had ingested lethal substances.[13]

---

[12] Gillman presents a Troy Police Department case report containing accounts of individuals who witnessed the efforts to revive Miller after she was found unresponsive.  See 7/19/23 Case Rep. (Dkt. 76-13).  These accounts indicate that Miller may not have been alive at that time.  See id. at PageID.3238 (reflecting (i) Green-Hernandez's report that "[person administering care] checked for a pulse and breathing and did not feel any" and (ii) Officer Gail Jasak's report that officials performed CPR for 25–30 minutes "in attempt to resuscitate the subject . . . [and did] not receiv[e] a pulse or improvement . . .").

[13] See Br. in Supp. Green-Hernandez Mot. at 15–18 (citing Hyman v. Lewis, 27 F.4th 1233, 1237 (6th Cir. 2022) (affirming grant of summary judgment to a defendant jail officer on Fourteenth Amendment deliberate indifference charge where detainee died in custody due to an overdose of multiple drugs, including fentanyl, concealed in his rectum, where court could "[]not say that a reasonable officer would have had reason to know of [detainee's] needs" because "no staff member observed [the detainee] manifesting an overdose while he was at the jail" and no other detainees in same room "signaled any concern that there might be something wrong with him"); Jones v. Mathews, 2 F.4th 607, 614 (7th Cir. 2021) (finding under Eighth Amendment that "no reasonable factfinder could determine that [official] knew of, and was indifferent to, a risk that [detainee] might die from diphenhydramine toxicity from ingesting smuggled pain medication" because the official "had no forewarning of this possibility" where defendant complained of stomach pain)).

The Court finds that Miller had an objectively serious medical need—i.e., the fentanyl overdose that caused her death—and that there is a genuine dispute of material fact as to whether Green-Hernandez knew or should have known that Miller suffered an unreasonably high risk of harm from this medical need.

The Court next considers whether a reasonable jury could find that Green-Hernandez's response constituted deliberate indifference.  See Helphenstine, 60 F.4th at 317.

### 3.   Whether Green-Hernandez responded deliberately and recklessly

In Gillman's view, Green-Hernandez's act of reckless disregard was "her failure to obtain medical care," which Green-Hernandez was required to seek after observing that Miller was vomiting.  Br. in Supp. Resp. to Green-Hernandez Mot. at 23.  This purported failure to act applies to both (i) the serious medical need indicated by Miller's continual vomiting, and (ii) the serious medical need posed to Miller's life by her ingestion of fentanyl, which her vomiting may have indicated.

Arguing that her response to Miller's medical needs was not "reckless," Green-Hernandez submits that (i) "Green-Hernandez responded by providing her food and drink," and that (ii) fellow-PSA Hirsch then checked on Miller twice before Miller was found unresponsive.  Br. in Supp. Green-Hernandez Mot. at 17–18.

As to Green-Hernandez's first point, Green-Hernandez testified that she brought Miller a meal and "another juice."   Green-Hernandez Dep. at 68–69.   Apparently, Green-Hernandez conducted her usual lunchtime routine, with the possible additional step of providing Miller with more fluids.   But this response does not meet Green-Hernandez's own expert's view of an appropriate treatment for the heroine withdrawal that Miller was known to have been suffering: "liquids with electrolytes for dehydration, aspirin, acetaminophen, [and] ibuprofen."   Simpson

Rep. at 3.  Green-Hernandez does not identify the electrolyte content, if any, of the juice she gave to Miller or argue that it contained sufficient electrolytes to address Miller's medical needs.  Nor does Green-Hernandez submit that she administered medication upon learning that Miller had vomited yet again.

It is also insufficient for Green-Hernandez to simply insist that she and her coworker monitored Miller.  "At a certain point, bare minimum observation ceases to be constitutionally adequate. . . .  At what point that occurred in this case will be for the jury to determine."  Greene v. Crawford Cnty., Michigan, 22 F.4th 593, 609 (6th Cir. 2022) (reversing grant of summary judgment to defendants on Fourteenth Amendment claim).

The record includes Green-Hernandez's testimony that Miller rejected Green-Hernandez's offer to obtain medical assistance.  Gillman doubts that Green-Hernandez's testimony can be trusted, and he submits that Green-Hernandez should have provided medical care even if Miller rejected it.  See Br. in Supp. Resp. to Green-Hernandez Mot. at 24.  The Court agrees that Miller's purported rejection of the need for medical care does not remove all disputed material facts as to whether Green-Hernandez was deliberately indifferent by declining to seek help.  See, e.g., Brawner, 14 F.4th at 589 (finding that reasonable jury could find that plaintiff presented a cognizable Fourteenth Amendment deliberate indifference claim based on insufficient response to her medical needs even where, upon arrival at jail, detainee "denied having a serious medical condition that required attention").

The Court concludes that a jury could reasonably find that Green-Hernandez's response to Miller's medical needs constituted deliberate and reckless action "in the face of an unjustifiably high risk of harm" that was known to Green-Hernandez.  Helphenstine, 60 F.4th at 317 (punctuation modified).  Like in Helphenstine and Greene, "a jury could find that [Miller] was in

17

obvious need of <u>some</u> medical attention . . . ."  <u>Id.</u> at 317 (quoting <u>Greene</u>, 22 F.4th at 608–609) (punctuation modified, emphasis in <u>Helphenstine</u> and <u>Greene</u>)).  But Green-Hernandez failed to seek medical attention.  "A jury could reasonably conclude that [she] recklessly failed to act reasonably by not seeking medical assistance for [Miller]."  <u>Id.</u> at 320.

### 4.  Whether Green-Hernandez is entitled to qualified immunity

"Qualified immunity shields public officials from personal liability under § 1983 unless they violate clearly established statutory or constitutional rights of which a reasonable person would have known."  <u>Helphenstine</u>, 60 F.4th at 326 (punctuation modified).  Relying on <u>Hyman</u>— which did not make a finding as to qualified immunity—Green-Hernandez submits that "there is a published case rejecting an argument nearly identical to Plaintiff's," and so "it is not clearly established that PSA Green-Hernandez" violated Miller's Fourteenth Amendment rights.  Br. in Supp. Green-Hernandez Mot. at 20–21.

But <u>Hyman</u> is distinguishable for the reasons discussed.  "It has been true since 1972 that 'where the circumstances are clearly sufficient to indicate the need of medical attention for injury or illness, the denial of such aid constitutes the deprivation of constitutional due process.'" <u>Helphenstine</u>, 60 F.4th at 327 (rejecting qualified immunity defense) (quoting <u>Greene</u>, 22 F.4th at 615)).  There is a material dispute of fact as to whether Green-Hernandez violated this clearly established constitutional right.  Accordingly, the Court rejects Green-Hernandez's qualified immunity defense.

The Court denies Green-Hernandez's motion for summary judgment as to Gillman's Fourteenth Amendment claim, though it deems waived Gillman's Eighth Amendment claim.

### B.  Gross Negligence

A governmental officer "is immune from tort liability for an injury" caused pursuant to "employment or service . . . on behalf of" a governmental agency unless the officer's conduct "amount[s] to gross negligence that is the proximate cause of the injury or damage." Mich. Comp. L. § 691.1407(2)(c).  "Gross negligence" is "conduct so reckless as to demonstrate a substantial lack of concern for whether an injury results." § 691.1407(8)(a).

The Court denies summary judgment to Green-Hernandez on the gross negligence count for the same reasons it denies summary judgment on the due process count.  Like in <u>Kindl v. City of Berkley</u>, "[a] jury could find that [Green-Hernandez] displayed 'a substantial lack of concern for whether an injury results' when [she] failed to seek or provide any medical assistance for [Miller] . . . despite her visible symptoms." 798 F.3d 391, 404 (6th Cir. 2015) (affirming denial of governmental immunity at summary-judgment stage on Michigan gross negligence claim based on detainee's death from alcohol withdrawal while in custody).  Green-Hernandez insists that she responded reasonably to Miller's behavior given that Miller appeared to be acting normally, <u>see</u> Br. in Supp. Green-Hernandez Mot. at 23, but Green-Hernandez fails to mention her knowledge that Miller was continually vomiting—a "visible symptom[]" indicating a need for medical care, in response to which a reasonable jury could find that Green-Hernandez displayed a substantial lack of concern, <u>Kindl</u>, 798 F.3d at 404.

Green-Hernandez's argument that her failure to provide medical care was not the proximate cause of Miller's fentanyl-induced death is also unavailing.  <u>See</u> Br. in Supp. Green-Hernandez Mot. at 23–24.  There is a factual dispute as to whether Green-Hernandez displayed a substantial lack of concern for a symptom of Miller fentanyl overdose—that is, vomiting.  And

even if Green-Hernandez's conduct was not the cause of Miller's death, Miller may have other cognizable injuries resulting from Green-Hernandez's grossly negligent conduct.

The Court rejects Green-Hernandez's defense to Gillman's gross negligence claim, and it denies her motion for summary judgment.

### C. Municipal Liability for the City

Gillman seeks to hold the City liable for his surviving deliberate indifference claim against Green-Hernandez. "A municipality cannot be liable under a theory of respondeat superior; it can only be held liable for its own wrongdoing," which "requires plaintiff to demonstrate that the alleged federal violation occurred because of a municipal policy or custom." Helphenstine, 60 F.4th at 323 (punctuation modified) (citing Monell v. Dep't of Soc. Servs. of City of New York, 436 U.S. 658 (1978)).

Gillman presents a failure-to-train theory of Monell liability, which is the "most tenuous" basis for asserting "[a] municipality's culpability for a deprivation of rights." Connick v. Thompson, 563 U.S. 51, 61 (2011). Under this approach, Gillman must show that "(1) [] the [City's] training or supervision was inadequate for the tasks performed; (2) the inadequacy was the result of the municipality's deliberate indifference; and (3) the inadequacy was closely related to or actually caused the injury." Helphenstine, 60 F.4th at 323 (punctuation modified).

In Gillman's view, "while Defendant City of Troy may have had appropriate policies on paper, Green-Hernandez and her colleagues were not trained on several of those policies . . . ." Br. in Supp. Resp. to City Mot. at 23. Specifically, Gillman relies on (i) General Order 5.23.19(B), which requires a PSA to conduct a physical observation of a prisoner who "is deemed to be a medium or high security, medical, or psychological risk . . . as often as possible and at least once every fifteen (15) minutes," Troy General Order at 37; and (ii) General Order 5.23.13, which states

that "a prisoner may be at risk to suffer a serious medical problem due to their intoxicated state" and that "[i]ndicators of severe intoxication include . . . vomiting . . . ," id. at 32.  Gillman points to Green-Hernandez's testimony that she did not receive specialized training on these policies; rather, she was told to familiarize herself with them on her own and sign off that she had reviewed them.  See Green-Hernandez Dep. at 14, 107.

As to the supposed inadequacy of this training, the City offers the testimony of Chief Frank Nastasi, who submits that—contrary to Green-Hernandez's understanding—PSAs go through 16 weeks of lockup training.  Natasi Dep. at 20–21 (Dkt. 79-5).  This lockup training is listed within the City's policies as General Order 5.23.39.  See Troy General Order at 2.  In the City's view, the sign-off procedure referenced by Green-Hernandez relates to updates to the policies, and Green-Hernandez took the original training back in 2000, City Reply at 9–10—which she may have forgotten she took by the time of her deposition, some two decades after her initial training.

Even if the Court accepts Gillman's positions that the City presented Green-Hernandez with its policies instead of directly training her on them, and that this training was inadequate, Gillman cannot prevail on the remaining two prongs of the failure-to-train theory.

Gillman has not created a genuine dispute of material fact that the inadequate training was "the result of the municipality's deliberate indifference."  Helphenstine, 60 F.4th at 323.  Gillman concedes that the City "may have had appropriate policies on paper."  Br. in Supp. Resp. to City Mot. at 23.  Thus, "Plaintiff's failure-to-train claim is based on little more than an argument that the [municipal defendant] did not do enough to ensure that [its employees] were familiar with the policies applicable to inmates needing medical care."  Wright v. Cnty. of Franklin, Ohio, 881 F. Supp. 2d 887, 908 (S.D. Ohio 2012) (granting summary judgment to municipal defendants on Fourteenth Amendment deliberate indifference claim).  This theory is not sufficient to establish

municipal deliberate indifference.  "[I]n the situation where a local government 'does create reasonable policies, but negligently administers them, there is no deliberate indifference and therefore no § 1983 liability.'"  Id. (quoting Perez v. Oakland Cnty., 466 F.3d 416, 430 (6th Cir.2006) (punctuation modified)); see also Gray v. City of Detroit, 399 F.3d 612, 618 n.1 (6th Cir. 2005) ("Deliberate indifference remains distinct from mere negligence").

The cases cited by Gillman do not support his failure-to-train claim.  See Br. in Supp. Resp. to City Mot. at 16–22.  Gillman relies on City of Canton, Ohio v. Harris, but this case did not find that the plaintiff had made out a Monell claim; rather, it clarified the weight of the burden that Gillman attempts to lift here:

> Only where a municipality's failure to train its employees in a relevant respect evidences a deliberate indifference to the rights of its inhabitants can such a shortcoming be properly thought of as a city "policy or custom" that is actionable under § 1983. . . .  Only where a failure to train reflects a deliberate or conscious choice by a municipality—a "policy" as defined by our prior cases—can a city be liable for such a failure under § 1983.

489 U.S. 378, 389 (1989) (punctuation modified).

Gillman also cites Helphenstine, but though the court in that case found that the plaintiff had satisfied the deliberate indifference prong on a Monell claim, it emphasized the unavailability of the doctor who, per written policy, was "required [] to visit the jail only once a week."  60 F.4th at 325.  There, "[t]he jail doctor was unable to deal with common medical conditions at the jail, and he was rarely present at the jail."  Id.  This deficiency is nothing like the issue in the present case.  Gillman submits that, like in Helphenstine, the City had no medical personnel on site.  See Br. in Supp. Resp. to City Mot. at 22.  But this superficial similarity does not make this case like Helphenstine, where jail personnel tried to reach the doctor over multiple days but failed to obtain his assistance because—per municipal policy—he was unavailable.  60 F.4th at 312–313.  Here,

in contrast, when City employees finally pulled the trigger and called for medical assistance, medical professionals arrived within minutes.

Shadrick v. Hopkins Cnty., Ky., provides another point of contrast.  805 F.3d 724 (6th Cir. 2015).   There, the plaintiff's failure-to-train claim on an Eighth Amendment deliberate indifference claim survived summary judgment where "[t]he evidence reveal[ed] that [the municipal entity] did not have a training program."  805 F.3d at 740.  In Shadrick, nurses who had provided constitutionally deficient care "professed ignorance of the written medical treatment protocols and policies purportedly drafted by [the municipal entity] to guide their conduct."  Id. Here, in contrast, Green-Hernandez testified that she was aware of the City policies that applied to her.  See Green-Hernandez Dep. at 99 ("[W]e [PSAs] all know the General Orders.  We might forget some here or there, but I mean we know the general ones that pertain to us.").

Gillman argues without citing to record evidence that Green-Hernandez was "unfamiliar" with General Order 5.23.13, see Br. in Supp. Resp. to City Mot. at 23, but this assertion is incorrect; when presented with this policy during deposition, Green-Hernandez indicated that she had seen it before, see Green-Hernandez Dep. at 154–155.  Also, in Shadrick, "[a] genuine issue of material fact exist[ed] about whether [the municipality] required the nurses to sign documents attesting that they had read and understood the [] policies and protocols."  805 F.3d at 740.  No such dispute of fact exists here; at the very least, the City required Green-Hernandez to sign off on having reviewed the policies.

Gillman has not demonstrated that the City's purportedly inadequate training here "evidences a deliberate indifference to the rights of its inhabitants . . . ."  City of Canton, 489 U.S. at 389 (punctuation modified).  At most, Gillman's charge that the City adopted a training program that it should have administered more effectively amounts to a claim of negligence, which is

23

insufficient for a deliberate indifference claim.  See Gray, 399 F.3d at 618 n.1; Wright, 881 F. Supp. 2d at 908.

Finally, Gillman has failed to create a genuine issue of material fact as to whether "the inadequacy was closely related to or actually caused the injury."  Helphenstine, 60 F.4th at 323 (punctuation modified).   Gillman submits that Green-Hernandez was "unfamiliar with the conditions that triggered a rotation every 15 minutes as opposed to just every 30 minutes" under General Order 5.23.19, Br. in Supp. Resp. to City Mot. at 23, apparently disregarding Green-Hernandez's testimony that people who were suicidal or who had been in cardiac arrest required these more frequent cell checks, see Green-Hernandez Dep. at 134.  Gillman also submits that, if "Green-Hernandez [had] been doing rounds every 15 minutes," which he thinks was "required," then Green-Hernandez would have caught Miller's "suspected" fentanyl overdose and delivered medical attention sooner.  Br. in Supp. Resp. to City Mot. at 23–24.

But the potential constitutional violation here was not Green-Hernandez's failure to check on Miller more often; it was her failure—after she had been alerted to indications that Miller had a serious medical need—to obtain medical care.  The supposed inadequacy in training PSAs on cell checks is not related to or causal of this violation.  Helphenstine, 60 F.4th at 323.[14]

---

[14] Nor could Gillman establish that more frequent checks on Miller after her overdose would have caught her condition, even if that theory were sufficient for liability.  Two cell checks were performed at 2:20 p.m. and 3:04 p.m.—within an hour of Miller being found unresponsive (and possibly dead)—but they did not alert the PSAs to Miller's state.  This circumstance is like Hyman, where the Sixth Circuit found no constitutional violation for a jail official who visually checked on detainees through cell windows over about four hours but failed to comply with a protocol requiring that officers physically check detainees every 30 minutes to ensure that they were "living and breathing," thus failing to catch that a detainee was at risk of death due to concealed narcotics. 27 F.4th at 1236–1238 (punctuation modified).

Gillman also suggests that Green-Hernandez was "trained to act in contravention" of General Order 5.23.19, which required that PSAs enter a cell upon learning of a medical emergency.  Br. in Supp. Resp. to City Mot. at 23.  He refers to Green-Hernandez's testimony that she was trained to call for help rather than enter a cell upon learning of a medical emergency if only two people

Gillman has failed to establish a <u>Monell</u> claim.  The Court grants the City's motion for summary judgment.

### D.  Green-Hernandez's Motions to Exclude Gillman's Expert Testimony

Without directly citing them or relying on them for his arguments, Gillman cites three reports of purported experts in his responses to Defendants' motions for summary judgment: (i) the affidavit of Thomas Tiderington (Dkt. 76-20) (opining that "the defendants knowingly and intentionally violated numerous department policies and demonstrated a complete and total indifference to the case and medical needs of Megan Miller"), (ii) the affidavit of W. Ken Katsaris (Dkt. 76-21) (opining as to the reasonableness of procedures used to detain Miller and the preventability of her death), and (iii) the affidavit of Amelia Shelton (Dkt. 76-22) (opining as to Miller's likely employability and wages).

Green-Hernandez has moved to strike all three of these purported experts (Dkts. 42, 44, 48).  She submits that the expert reports fail to meet the requirements of Federal Rule of Evidence 702 because the experts are not qualified to provide the opinions they intend to offer, their opinions lack factual support, and their opinions are not the product of the application of reliable principles and methods.  <u>See</u> Br. in Supp. Mot. to Strike Shelton at 8–16; Br. in Supp. Mot. to Strike Tiderington at 10–22 (also arguing that certain proposed opinions offer legal conclusions in violation of Federal Rule of Evidence 704); Br. in Supp. Mot. to Strike Katsaris at 9–22 (also presenting Rule 704 challenge).  Further, in Green-Hernandez's view, the expert reports fail to

---

were on staff.  <u>See</u> Green-Hernandez Dep. at 152.  When Green-Hernandez found Miller unresponsive, she called for assistance rather than entering Miller's cell.  <u>See</u> <u>id.</u> at 70–72.  But Gillman has not proposed that this act was a constitutional violation, nor could he do so successfully.  A failure to comply with an on-paper policy is not a Fourteenth Amendment violation, <u>see</u> <u>Hyman</u>, 27 F.4th at 1238, and Green-Hernandez's act of immediately calling for help—which arrived in about three minutes—did not constitute reckless disregard for Miller's medical needs.

comply with Federal Rule of Civil Procedure 26(a)(2) because they do not disclose the facts, data, and rational bases underlying their opinions.  See Br. in Supp. Mot. to Strike Shelton at 16–19; Br. in Supp. Mot. to Strike Tiderington at 22–25; Br. in Supp. Mot. to Strike Katsaris. at 22–25.

Gillman did not file responses to any of these motions.  "When a plaintiff does not respond to a defendant's argument, the plaintiff waives any opposition to the argument."  Hardin v. Bank of Am., N.A., No. 22-cv-10023, 2022 WL 3568568, at *2 (E.D. Mich. Aug. 18, 2022).  Without the benefit of Gillman's position on these motions, the Court deems any opposition waived and grants Green-Hernandez's motions to strike.

### III. CONCLUSION

For the reasons explained above, the Court denies Green-Hernandez's motion for summary judgment (Dkt. 40), grants the City's motion for summary judgment (Dkt. 37), and grants Green-Hernandez's motions to strike (Dkts. 42, 44, 48).  The Court also deems waived Gillman's Eighth Amendment claim.  Gillman has surviving claims against Green-Hernandez under the Fourteenth Amendment and a theory of gross negligence.

SO ORDERED.

Dated: July 25, 2023                                          s/Mark A. Goldsmith
          Detroit, Michigan                                  MARK A. GOLDSMITH
                                                             United States District Judge