# UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

| | | |
|---|---|---|
| Kelly L. Stephens<br>Clerk | 100 EAST FIFTH STREET, ROOM 540<br>POTTER STEWART U.S. COURTHOUSE<br>CINCINNATI, OHIO 45202-3988 | Tel. (513) 564-7000<br>www.ca6.uscourts.gov |

Filed: January 22, 2025

Mr. Michael T. Berger
Ms. Margaret T. Debler
Rosati Schultz Joppich & Amtsbuechler
27555 Executive Drive
Suite 250
Farmington Hills, MI 48331-5627

Mr. Christopher Patrick Desmond
Ven Johnson Law
535 Griswold Street, Suite 2600
Detroit, MI 48226

Re: Case No. 23-1702, *Steven Gillman v. City of Troy, MI, et al*
Originating Case No. : 2:21-cv-12762

Dear Counsel,

  The court today announced its decision in the above-styled case.

  Enclosed is a copy of the court's published opinion together with the judgment which has been entered in conformity with Rule 36, Federal Rules of Appellate Procedure.

  Yours very truly,

  Kelly L. Stephens, Clerk

  Cathryn Lovely
  Deputy Clerk

cc: Ms. Kinikia D. Essix

Enclosures

Mandate to issue.

RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 25a0014p.06

# UNITED STATES COURT OF APPEALS

FOR THE SIXTH CIRCUIT

---

STEVEN GILLMAN, as personal representative of the estate of Megan Miller, Deceased,

   *Plaintiff-Appellee*,

*v.*

CITY OF TROY, MICHIGAN,

   *Defendant*,

JULIE GREEN-HERNANDEZ,

   *Defendant-Appellant*.

> No. 23-1702

---

Appeal from the United States District Court for the Eastern District of Michigan at Detroit.
No. 2:21-cv-12762—Mark A. Goldsmith, District Judge.

Argued: October 31, 2024

Decided and Filed: January 22, 2025

Before: COLE, MATHIS, and BLOOMEKATZ, Circuit Judges.

---

**COUNSEL**

**ARGUED:** Margaret T. Debler, ROSATI SCHULTZ JOPPICH & AMTSBUECHLER, PC, Farmington Hills, Michigan, for Appellant. Christopher P. Desmond, VEN JOHNSON LAW PLC, Detroit, Michigan, for Appellee. **ON BRIEF:** Margaret T. Debler, Michael T. Berger, Marcelyn A. Stepanski, ROSATI SCHULTZ JOPPICH & AMTSBUECHLER, PC, Farmington Hills, Michigan, for Appellant. Christopher P. Desmond, VEN JOHNSON LAW PLC, Detroit, Michigan, for Appellee.

---

# OPINION

---

BLOOMEKATZ, Circuit Judge. When Megan Miller was arrested and booked into the City of Troy's pretrial detention facility, she informed facility staff that she had been heavily using heroin and expected to go into withdrawal within about a day. Over the next two and a half days, Miller vomited continually. On the third day of her detention, Miller was found unconscious and unresponsive in her cell. She was pronounced dead soon after.

Despite Miller's continual vomiting, no jail official sought medical care for her—not even Julie Green-Hernandez, one of the employees responsible for monitoring the City's pretrial detainees on the day of Miller's death. So Miller's husband sued Green-Hernandez, arguing that she violated Miller's constitutional right to adequate pretrial medical care under the Fourteenth Amendment and violated Michigan state law by acting with gross negligence.

In this appeal, Green-Hernandez asks us to reverse the district court's conclusion that she is not entitled to qualified immunity on the Fourteenth Amendment claim or state law immunity on the negligence claim. Because Green-Hernandez's arguments regarding qualified immunity are premised on disagreements with the district court's factual findings, we lack jurisdiction over the qualified immunity question and dismiss that part of Green-Hernandez's appeal. Our jurisdiction is proper, however, over the district court's denial of Green-Hernandez's claim to governmental immunity under Michigan state law, and on that question we reverse.

## BACKGROUND

**I.　　Factual Background**[1]

In July 2020, Megan Miller was arrested on a parole absconder warrant and transported to the City of Troy's pretrial detention facility. During the booking process, Miller stated that she was experiencing abdominal pain and had taken heroin about an hour before being arrested. Facility staff noted Miller's condition on her booking forms. During an interview with a police

---

[1] We recite the facts in the light most favorable to the plaintiff.

detective shortly thereafter, Miller stated that she had been using heroin "a lot" and that she expected to begin experiencing symptoms of heroin withdrawal within about a day. Op., R. 95, PageID 3723. Miller was then detained in a holding cell in the lockup facility.

Miller remained in the holding cell until she died two and a half days later. That morning, at approximately 7:00 a.m., Julie Green-Hernandez signed in for a shift as a Police Service Aid (PSA) for the City of Troy Police Department. PSAs like Green-Hernandez are tasked with monitoring pretrial detainees, performing routine cell checks, and reporting anything unusual to the on-duty police officer supervising them. PSAs must record each time they check a prisoner using a time stamp log in the facility's control room. PSAs are required to physically observe each prisoner at least every thirty minutes, either by walking by a prisoner's cell or by observing a prisoner remotely using the facility's cameras—but only if the camera's view allows them to confirm the prisoner's wellbeing. And where a prisoner presents a medical, security, or psychological risk, PSAs are required to conduct a physical observation of the prisoner as often as possible and at least every fifteen minutes. The City of Troy Police Department's policies explain that prisoners who are intoxicated may present serious medical problems and that vomiting is an indication of severe intoxication.

At the start of her shift, Green-Hernandez reviewed the booking materials for the facility's current detainees and noticed that Miller's materials stated that she was going through heroin withdrawal. Green-Hernandez then spoke with two PSAs with whom her shift overlapped; they both informed her that Miller had been vomiting.

The facility's cell-check log for July 19, the third day of Miller's detention, shows that between 7:00 a.m. and noon, Green-Hernandez and a fellow PSA checked Miller's cell at fairly regular intervals. After a shift change at noon, a different PSA joined Green-Hernandez on duty. What happened during the afternoon is disputed. The only video of the relevant events is from a camera that is angled to show the hallway outside of Miller's cell. The recording shows very little of the inside of the cell—though it does show when an officer walks by the cell—and does not contain audio. And, because Miller tragically died, the primary testimony concerning the events comes from Green-Hernandez.

Between 12:40 p.m. and 1:00 p.m., Green-Hernandez visited Miller's cell three times and interacted with Miller. At this time, Green-Hernandez observed more vomit in Miller's cell. Green-Hernandez testified that, vomiting aside, Miller appeared healthy and showed no signs of physical distress. Green-Hernandez also testified that she offered Miller medical attention, which she claims Miller declined.

The facility's cameras do not show either Green-Hernandez or the other PSA on duty walk by Miller's cell at any point between 1:00 and 3:20 p.m. The cell-check log likewise does not reflect that Green-Hernandez checked on Miller at any time between 1:00 p.m. and 3:20 p.m. Green-Hernandez, however, testified that she remotely checked on Miller at least once between 1:30 and 2:00 p.m., but "forgot" to log this cell check. *Id.* at PageID 3726. She claimed that during this cell check, she saw Miller's foot move while Miller was laying down, which she took to mean that Miller was "okay." *Id.* The facility's cell-check log shows that the other PSA on duty checked on Miller twice, presumably remotely, at 2:20 p.m. and at 3:04 p.m.

At 3:20 p.m., Green-Hernandez returned to Miller's cell and found Miller unresponsive. Attempts to revive Miller were unsuccessful. EMS transported Miller to the hospital. Miller's hospital records state that an officer at the jail informed EMS that the last time anyone saw Miller conscious was 12:30 p.m. Miller was pronounced dead shortly after arriving at the hospital.

## II.    Procedural Background

Miller's husband, Steven Gillman, in his capacity as personal representative of Miller's estate, filed suit against Green-Hernandez in her individual capacity.**2** He asserted a claim under 42 U.S.C. § 1983, arguing that Green-Hernandez had violated Miller's Fourteenth Amendment right to receive adequate medical care while in custody as a pretrial detainee. Gillman also brought a Michigan state law claim against Green-Hernandez for gross negligence.

---

**2**Gillman also brought a claim against the City of Troy, arguing that the City was liable for its alleged failure to train Green-Hernandez not to be deliberately indifferent to detainees' serious medical needs. The district court granted summary judgment to the City, and Gillman did not cross-appeal the district court's decision.

Green-Hernandez moved for summary judgment, contending that she was entitled to qualified immunity on Gillman's federal claim and Michigan governmental immunity on Gillman's state law claim. With her motion, Green-Hernandez presented evidence that Miller had died from an overdose of fentanyl that she had ingested while detained, not from heroin withdrawal.

The district court denied Green-Hernandez's motion. *First*, the district court held that Green-Hernandez was not entitled to qualified immunity on Gillman's Fourteenth Amendment denial of adequate medical care claim. The district court found it uncontroverted that fentanyl ingestion was the cause of Miller's death. But it explained that, regardless, it was undisputed that Green-Hernandez had been aware that Miller was continually vomiting. That continual vomiting was itself an objectively serious medical need, and Gillman had raised a dispute of material fact as to whether Miller had been deliberately indifferent to that need. The district court then reasoned that fentanyl overdose, the cause of Miller's death, was also an objectively serious medical need—and vomiting is a symptom of fentanyl overdose. Green-Hernandez's evidence showed that Miller had to have ingested fentanyl and then showed signs of a fentanyl overdose within 60 minutes of her death. And there was a dispute of fact as to when, precisely, Miller died. So, the district court explained, it was possible that the vomit Green-Hernandez noticed when she talked with Miller around 12:40 p.m. was actually a symptom of Miller's overdose. Gillman had accordingly raised a dispute of material fact as to whether Green-Hernandez had been alerted to symptoms of Miller's fentanyl overdose and then been deliberately indifferent in response. *Second*, the district court held that Green-Hernandez was not entitled to Michigan governmental immunity because Gillman had raised a dispute of material fact about whether Green-Hernandez had acted in a grossly negligent manner and was the proximate cause of Miller's death.

Green-Hernandez timely appealed.

## ANALYSIS

I.  **Qualified Immunity**

Green-Hernandez begins by contesting the district court's order denying her motion for summary judgment on her qualified immunity defense. We review the district court's denial of qualified immunity de novo. *See Helphenstine v. Lewis County*, 60 F.4th 305, 314 (6th Cir. 2023), *cert. denied*, 144 S. Ct. 692 (2024). "A public official is entitled to qualified immunity at summary judgment when, viewing the facts in the light most favorable to the plaintiff, the challenged conduct did not violate 'clearly established . . . constitutional rights of which a reasonable person would have known.'" *Heeter v. Bowers*, 99 F.4th 900, 908 (6th Cir. 2024) (alteration in original) (quoting *Jackson v. City of Cleveland*, 64 F.4th 736, 745 (6th Cir. 2023)). Before we can address the merits of Green-Hernandez's qualified immunity arguments, however, we must confirm that we have jurisdiction over this appeal. We don't, so our qualified immunity analysis starts and ends with that threshold issue.

We generally have authority to hear appeals only from "final decisions" of the district courts, 28 U.S.C § 1291, and an order denying a motion for summary judgment is not typically such a decision, *Heeter*, 99 F.4th at 908. But because qualified immunity involves immunity from suit, not just from liability, a district court's denial of summary judgment as to a qualified immunity defense can—in some circumstances—be reviewed on an interlocutory basis under the collateral order doctrine. *See Mitchell v. Forsyth*, 472 U.S. 511, 526–27, 530 (1985).

Our jurisdiction to hear an interlocutory appeal concerning qualified immunity turns on whether the defendant's appeal raises questions of fact or of law. *Berryman v. Rieger*, 150 F.3d 561, 562–63 (6th Cir. 1998). We can review a denial of qualified immunity "only to the extent" that the appeal "turns on an issue of law." *Adams v. Blount County*, 946 F.3d 940, 948 (6th Cir. 2020) (citation omitted). By contrast, we have no jurisdiction to review an appeal that is based on the defendant's "quarrel with the plaintiff's record-supported facts, which the district court must adopt at summary judgment." *Heeter*, 99 F.4th at 908. Accordingly, we "have consistently declined to exercise jurisdiction over appeals where the officer's dispute of facts is 'crucial to' the appeal." *Id.* at 909 (quoting *Adams*, 946 F.3d at 951). The "onus is on the defendant to

comply with this jurisdictional limit." *Gillispie v. Miami Township*, 18 F.4th 909, 915 (6th Cir. 2021).

When the record contains genuine factual disputes, a defendant may nonetheless "invoke our jurisdiction by conceding the plaintiff's version of the facts" for the purposes of appeal. *Anderson-Santos v. Kent County*, 94 F.4th 550, 554 (6th Cir. 2024). That concession allows us to put record disputes aside and decide the purely legal question whether, considering the facts in the light most favorable to the plaintiff, the defendant violated the plaintiff's clearly established constitutional rights. To invoke our jurisdiction, a defendant's concession to the plaintiff's version of the facts must be genuine—that is, a defendant may not "purport[] to concede the plaintiff's view of the facts" for the purposes of attaining appellate jurisdiction but then "in effect still litigate[] the factual dispute." *Id.* at 554–55. In *Anderson-Santos*, the defendant stated that he was willing to concede the facts to invoke the court's appellate jurisdiction, but then "recite[d] a version of the facts" that contradicted the record viewed in the light most favorable to the plaintiff and raised arguments that relied on material and "disputed" facts. *Id.* at 554. We held that we lacked jurisdiction over the appeal, explaining that "a concession in name only is no concession at all." *Id.*

Here, Green-Hernandez's arguments on appeal fail to construe the record in the light most favorable to Gillman, and she has failed to adequately concede the material facts, as she must to invoke our jurisdiction. As in *Anderson-Santos*, Green-Hernandez has offered us a "concession in name only," despite repeated opportunities before this court to offer a genuine concession. *Id.*

*First*, in Green-Hernandez's opening brief on appeal, she repeatedly relied on her "version of the facts" to support her arguments. *Adams*, 946 F.3d at 951. She emphasized, for example, that Miller did not show any signs of physical distress and that she had offered Miller medical attention—even though the district court noted that those facts were supported only by Green-Hernandez's testimony (which a reasonable jury could choose to disbelieve).

*Second*, after the parties completed their merits briefing, we ordered them to submit supplemental briefing on appellate jurisdiction. In her supplemental brief, Green-Hernandez

attempted to invoke our jurisdiction with a concession to Gillman's version of the facts: she stated that she "accept[s] the District Court's adopted facts, at least to the extent they are not contradicted by video evidence." Appellant's Suppl. Br. at 2. But the rest of her supplemental brief demonstrated that she was only superficially accepting Gillman's version of the facts—she followed her so-called concession with a recitation of the facts that was not construed in the light most favorable to Gillman.

Consider just a few examples where Green-Hernandez continued to quarrel about which facts are sufficiently supported by the record. Green-Hernandez characterized the record as showing that she was aware when she started work that Miller "had vomited," but that Green-Hernandez knew no "other information" about Miller's condition. *Id.* Yet the district court found it undisputed that Green-Hernandez was aware that Miller had been vomiting *continually* while in custody—and that a PSA on duty with Green-Hernandez had told her as much when she started work. Green-Hernandez also stated that Miller did not show signs of physical distress, that Green-Hernandez had performed "regular" cell checks, and that Green-Hernandez had performed a cell check and observed Miller's foot move on camera shortly before Miller's death. *Id.* at 3. The district court, however, noted that those facts were supported only by Green-Hernandez's own testimony—and the credibility of such testimony could be questioned by a reasonable jury, especially given the contradictory facts in the record showing that Green-Hernandez was not following protocol. Elsewhere in her supplemental brief, Green-Hernandez explicitly contested the district court's factual findings, explaining that she "takes issue with some of the trial court's acceptance of" facts and believes that "certain portions" of the district court's factual findings are "unsupported." *Id.* at 6. She did not identify in her brief which specific facts she believes lack record support, but she made clear that she was not genuinely accepting the district court's construction of the record.

*Finally*, any doubt regarding whether Green-Hernandez was willing to genuinely concede Gillman's version of the facts for the purposes of our jurisdiction was resolved at oral argument. There, Green-Hernandez's counsel explained that although Green-Hernandez was willing to concede the district court's "adopted facts," her position was that she needed to concede only the "record-supported facts"—that is, the district court's factual findings that Green-Hernandez

believed had adequate support in the record. Oral Arg. Rec. at 1:20–1:44. In response to the court's questions, Green-Hernandez's counsel stated that Green-Hernandez was unwilling to concede for the purpose of appeal that she knew that Miller had been continually vomiting in the days prior to her shift. Green-Hernandez also would not concede that a jury could disbelieve her testimony that she saw Miller's foot move on camera prior to Miller's death during a cell check between 1:30 and 2:00 p.m.—even though that cell check is not shown on the video of Miller's cell and Green-Hernandez did not record it in the facility's time stamp log. Throughout oral argument, Green-Hernandez's counsel repeatedly relied on Green-Hernandez's version of the facts; she again contended that Miller never showed signs of distress and that there was "nothing" to put Green-Hernandez on notice that Miller was experiencing a serious medical need. *Id.* at 12:20–12:42.

Thus, her nominal concession notwithstanding, Green-Hernandez has contested the record-supported facts at virtually every juncture. And those disputed facts are "crucial to" the qualified immunity question. *Phelps v. Coy*, 286 F.3d 295, 298 (6th Cir. 2002). The extent to which Green-Hernandez was aware of Miller's condition, and what Green-Hernandez did in response to that condition, "go[es] to the heart of the legal issue"—whether Green-Hernandez's conduct "rises to" a violation of Miller's clearly established Fourteenth Amendment right to adequate medical care. *Adams*, 946 F.3d at 949. Because Green-Hernandez's arguments rely on these critical factual disputes, we lack jurisdiction to conduct the interlocutory review she seeks. *See McKenna v. City of Royal Oak*, 469 F.3d 559, 561 (6th Cir. 2006). We accordingly dismiss this part of Green-Hernandez's appeal.[3]

## II.   State Law Governmental Immunity

We next address the district court's decision denying Green-Hernandez Michigan governmental immunity on Gillman's gross negligence claim. Although the district court

---

[3]In addition to contesting the qualified immunity question, Green-Hernandez also argues on appeal that Gillman cannot satisfy the elements of a § 1983 claim because he cannot show that Green-Hernandez caused the deprivation of Miller's constitutional rights. We do not reach this question because we have no jurisdiction to consider it. Green-Hernandez's causation argument is unrelated to her qualified immunity defense, so we can exercise jurisdiction in this interlocutory appeal only if the issue is pendent to the qualified immunity question. And where, as here, we have no jurisdiction over the qualified immunity issue, we "necessarily ha[ve] no jurisdiction to consider a pendent § 1983 question." *McKenna*, 469 F.3d at 563.

correctly concluded that the record could support a finding that Green-Hernandez's conduct was grossly negligent, we nevertheless reverse its immunity decision because the record demonstrates that Green-Hernandez's conduct was not the single most direct cause of Miller's injuries.

Unlike with the qualified immunity issue, we have jurisdiction to address the district court's denial of state law governmental immunity to Green-Hernandez. When a federal case involves pendent state law claims, we look to state law to determine whether a denial of state law immunity is appealable. *Bennett v. Krakowski*, 671 F.3d 553, 560 (6th Cir. 2011), *abrogated on other grounds by Ga.-Pac. Consumer Prods. LP v. NCR Corp.*, 40 F.4th 481, 484 (6th Cir. 2022). As we've explained before, Michigan law provides that an order granting or denying governmental immunity under its immunity statute, Mich. Comp. Laws. § 691.1407, "constitutes a final order for the purposes of federal appellate review." *Smith v. County of Lenawee*, 600 F.3d 686, 689 (6th Cir. 2010). We accordingly have consistently "allowed interlocutory appeals to be taken from orders granting or denying governmental immunity" under Michigan law. *Id.*; *see also Bennett*, 671 F.3d at 560 (explaining that although the court lacked jurisdiction over the "qualified immunity interlocutory appeal," that did not "divest the court of jurisdiction over the appeal regarding governmental immunity under Michigan law").

We "review the denial of governmental immunity at the summary judgment stage de novo, viewing the facts and drawing inferences in the light most favorable to the plaintiff[]." *Ramsey v. Rivard*, 110 F.4th 860, 870 (6th Cir. 2024). Under Michigan law, government employees are generally immune from tort liability for injury to a person if they "are acting within the scope of their authority, performing government functions, and their conduct 'does not amount to gross negligence that is the proximate cause of the injury or damage.'" *Burwell v. City of Lansing*, 7 F.4th 456, 477 (6th Cir. 2021) (quoting Mich. Comp. Laws § 691.1407(2)). On appeal, Green-Hernandez disputes both that her conduct amounted to "gross negligence" and that it was the "proximate cause" of Miller's death.

We turn first to Green-Hernandez's argument that her conduct was not grossly negligent. Gross negligence under Michigan state law is "conduct so reckless as to demonstrate a substantial lack of concern for whether an injury results." Mich. Comp. Laws § 691.1407(8)(a). The district court held that a reasonable jury could conclude that Green-Hernandez was grossly

Case 2:21-cv-12762-MAG-KGA ECF No. 106, PageID.3912 Filed 01/22/25 Page 12 of 14 (12 of 14)

No. 23-1702   Gillman v. City of Troy, Mich., et al.   Page 11

negligent because she did not seek medical care for Miller despite her awareness that Miller was vomiting continually. That conclusion is well-supported by the record.

The record, construed in the light most favorable to Gillman, shows that Green-Hernandez was aware from the start of her shift that Miller was going through heroin withdrawal and had been vomiting for days. Green-Hernandez reviewed Miller's booking materials and was also informed by other PSAs that Miller had been vomiting. And Green-Hernandez became aware a few hours later, when she stopped by Miller's cell at around 12:40 p.m., that Miller had continued vomiting. Despite her awareness of Miller's persistent vomiting, Green-Hernandez did not seek medical care for Miller. To the contrary, viewed in the light most favorable to Gillman, the record shows that Green-Hernandez left Miller unattended for almost two and a half hours. From these facts, we agree with the district court that Gillman established a dispute of material fact as to whether Green-Hernandez's failure to seek medical care for Miller—or, indeed, to even monitor her condition—showed a "substantial lack of concern" for Miller's condition. *Id.*

We part ways with the district court, however, as to whether Green-Hernandez was "the proximate cause" of Miller's death, as that phrase is construed for the immunity statute. *See id.* § 691.1407(2)(c). The Michigan Supreme Court has explained that for the purposes of Michigan governmental immunity, "the proximate cause" means "the one most immediate, efficient, and direct cause preceding an injury." *Robinson v. City of Detroit*, 613 N.W.2d 307, 317 (Mich. 2000) (citing Mich. Comp. Laws § 691.1407(2)). Put differently, "conduct that is merely *a* proximate cause rather than *the* proximate cause of the injury" is insufficient. *Hyman v. Lewis*, 27 F.4th 1233, 1238 (6th Cir. 2022). A defendant may be subject to liability only if her conduct was the single most proximate cause of the plaintiff's injury.

It is undisputed that the cause of Miller's death was an overdose of fentanyl, which Miller must have ingested shortly before her death. Considering that fact, we hold that a reasonable jury could not conclude that the single most proximate cause of Miller's death was Green-Hernandez's failure to seek medical care in response to Miller's vomiting. Rather, the single most proximate cause of Miller's death was her ingestion of fentanyl. We have reached the same conclusion in similar prior cases. In *Burwell v. City of Lansing*, for example, a man was arrested

and, during the booking process, denied having taken any alcohol or drugs other than his epilepsy medication. *See* 7 F.4th at 460. He then displayed multiple symptoms of drug intoxication and died while detained without receiving medical care. *Id.* at 460–62. Although this court held that one of the detainee's jailers could be liable for deliberate indifference under the Fourteenth Amendment for failing to provide adequate medical care, we also concluded that the same jailer was entitled to Michigan governmental immunity because the detainee's choice to "voluntarily ingest[]" a cocktail of drugs—not the jailer's conduct—was the most proximate cause of the detainee's injuries. *See id.* at 478; *see also Hyman*, 27 F.4th at 1238–39 (explaining that because a detainee died of a drug overdose, the detainee's actions, not those of an officer responsible for monitoring detainees, were the proximate cause of his death).

The district court disagreed with this analysis. It held that Gillman had raised a dispute of material fact regarding whether Green-Hernandez was the proximate cause of Miller's death. Specifically, it explained that there was a dispute of material fact regarding whether Green-Hernandez had shown a substantial lack of concern for Miller's vomiting—a possible symptom of fentanyl overdose. But even so, that does not make Green-Hernandez's failure to provide care the single most proximate cause of Miller's death. *See Burwell*, 7 F.4th at 477–78. The inadequate care could be a but-for cause, or *a* proximate cause, but not *the* proximate cause under Michigan's standard. The district court also reasoned that Miller could have "other cognizable injuries," besides her death, that Green-Hernandez did proximately cause. Op., R. 95, PageID 3741. But the district court did not indicate what other injuries those could be, and Gillman does not clarify in his briefing.

Because Green-Hernandez was not "the proximate cause" of Miller's death, we conclude that she is entitled to Michigan governmental immunity and reverse the district court's contrary determination.

## CONCLUSION

We dismiss for lack of jurisdiction Green-Hernandez's appeal of the district court's denial of qualified immunity, reverse the district court's denial of Michigan governmental immunity, and remand for further proceedings consistent with this opinion.

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

No. 23-1702

STEVEN GILLMAN, as personal representative of the estate of Megan Miller, Deceased,

    Plaintiff - Appellee,

v.

CITY OF TROY, MICHIGAN,

    Defendant,

JULIE GREEN-HERNANDEZ,

    Defendant - Appellant.

FILED
Jan 22, 2025
KELLY L. STEPHENS, Clerk

Before: COLE, MATHIS, and BLOOMEKATZ, Circuit Judges.

# JUDGMENT

On Appeal from the United States District Court
for the Eastern District of Michigan at Detroit.

THIS CAUSE was heard on the record from the district court and was argued by counsel.

IN CONSIDERATION THEREOF, it is ORDERED that the appeal is DISMISSED IN PART, the judgment of the district court is REVERSED IN PART, and the case is REMANDED for further proceedings consistent with the opinion of this court.

ENTERED BY ORDER OF THE COURT

Kelly L. Stephens, Clerk